# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF CALIFORNIA, <u>ex</u> <u>rel</u>. [UNDER SEAL], <br><br> Plaintiff-Relator, <br><br> v. <br><br> [UNDER SEAL], <br><br> Defendant. | Case No. <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS AND THE CALIFORNIA INSURANCE FRAUDS PROTECTION ACT <br><br> **FILED IN CAMERA AND UNDER SEAL, PURSUANT TO 31 U.S.C. §3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

## DOCUMENT TO BE KEPT UNDER SEAL

## DO NOT ENTER INTO PACER

**CONSTANTINE CANNON LLP**
Seth D. Greenstein, MD Bar # 11298
Mary Inman
Jason Enzler
1001 Pennsylvania Avenue, NW
Washington DC 20004
Telephone: 202-204-3500
Facsimile: 202-204-3501
sgreenstein@constantinecannon.com

Attorneys for Plaintiff-Relator

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF CALIFORNIA, ex rel. JAMES M. CESARE | Case No.<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS AND THE CALIFORNIA INSURANCE FRAUDS PROTECTION ACT |
|           Plaintiff-Relator, | |
| v. | |
| SKYLINE UROLOGY | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
|           Defendant. | **JURY TRIAL DEMANDED** |

Relator James M. Cesare ( "Relator"), through his attorneys and on behalf of the United States of America (the "United States") and the State of California ("the State") (hereafter, collectively, the "Government"), for his Complaint against Defendant Skyline Urology ("Skyline" or "Defendant") alleges, based upon personal knowledge, as follows:

## I.   INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the Government arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendant and/or its agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("the federal FCA"), the California False Claims Act, Cal. Gov't Code § 12650 *et seq*. ("the California FCA"), and the California Insurance Frauds Protection Act, Cal. Ins. Code § 1871 *et seq*. ("the IFPA").

2.      Skyline and its individual physicians engaged in a systematic scheme to defraud the Government and California health insurance consumers by fraudulently billing government-funded healthcare programs and commercial insurers for Evaluation and Management ("E&M")

2

office visit services performed as part of and in connection with surgical procedures. The E&M services were not properly billable separately because pursuant to established billing and coding rules, the payment them was included in the bundled payment for the concomitant procedure.

3.      To evade these established billing and coding rules, Defendant fraudulently used a coding modifier (Modifier 25) to falsely claim that the E&M services were unrelated to the surgical procedure and thus separately reimbursable. Modifier 25 may only be used to claim additional payment for E&M services when a physician performs an E&M service that is "significant" and "separately identifiable" from an underlying medical procedure.

4.      Relator's audits of Defendant's Modifier 25 coding practices identified significant error rates across the practice. Overall, Skyline's physicians erroneously used Modifier 25 58% of the time during the five quarters Relator audited. Some doctors used it improperly in 100% of the cases Relator audited.

5.      Relator repeatedly warned Defendant that it was improperly billing government-funded healthcare programs and commercial insurers for E&M services through the improper use of Modifier 25. Nonetheless, Defendant refused to reform its billing and coding practices going forward or to refund the previously-submitted fraudulent claims.

6.      Had Defendant not fraudulently used Modifier 25, the government-funded healthcare programs and commercial insurers would not have paid for the affected E&M services.

7.      Each and every claim submitted to the Government and commercial insurers for an E&M service where Modifier 25 was improperly used to get the claim paid is a false or fraudulent claim in violation of the federal and California FCAs and the IFPA. Skyline has

submitted or caused to be submitted tens of thousands of such fraudulent claims to federal and state-funded healthcare programs as well as commercial insurers.

8.      The federal FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the United States to recover losses sustained as a result of fraud.  Specifically, the amendments created incentives 1) for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or inaction by the United States and 2) for the private bar to commit legal resources to prosecuting fraud on the United States' behalf.

9.      As relevant here, the federal FCA prohibits, *inter alia*: (1) knowingly presenting (or causing to be presented) a false or fraudulent claim for payment or approval by the United States; (2) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim submitted to the United States; and (3) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States.  31 U.S.C. §§3729(a)(1)(A)-(B), and (G).  Any entity that violates the federal FCA is liable for a civil penalty of up to $11,000 for each violation committed on or before November 2, 2015 and $21,563 for violations committed after that date, plus three times the amount of the damages sustained by the United States.

10.     The federal FCA allows any person with knowledge of a federal FCA violation to bring an action on behalf of the United States and to share in any recovery.  The federal FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the

defendant during that time) to allow the United States time to conduct its own investigation and to determine whether to join the suit.

11.     The California FCA prohibits similar conduct as that prohibited by the federal FCA (*see* Cal. Gov. Code § 12651(a)), allows relators to bring an action on the State's behalf (Cal. Gov. Code § 12652(c)(1)), and provides analogous remedies to those provided in the federal FCA (*see* Cal. Gov. Code § 12651(a)).

12.     The IFPA also prohibits similar conduct as that prohibited by the federal FCA and the California FCA, but does so with respect to fraud against commercial insurers (*see* Cal. Ins. Code § 1871 *et seq*.,), allowing relators to civilly enforce provisions of the California Penal Code that bar the submission of false claims for payment under a "contract of insurance" and providing analogous remedies to those provided in the federal and California FCAs.

13.     Based on the foregoing laws, Relator seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendant made or caused to be made to the Government and commercial insurers, and for Defendant's failure to repay overpayments owed to the Government and commercial insurers, related to Defendant's false and fraudulent practices related to coding E&M services using Modifier 25.

## II.   PARTIES

14.     Relator James M. Cesare is a citizen of the United States and resident of the State of Maryland.  For over 25 years, Relator has worked in the area of healthcare compliance and reimbursement with national and regional CPA firms.  Approximately ten years ago, Relator founded Bay Area Healthcare Advisors, LLC ("Bay Area"), and has served as that company's President and Chief Executive Officer during that time.  Under Relator's direction, Bay Area

provides consulting services to healthcare providers regarding compliance and reimbursement issues. The primary service Bay Area provides is to audit and educate healthcare providers regarding proper coding and billing practices.

15.     Notably, this service includes acting as an Independent Review Organization for approximately ten healthcare providers who have entered into corporate integrity agreements with the Office of the Inspector General ("OIG") for the U.S. Department of Health and Human Services ("HHS"). As part of this service, Relator submits regular reports to the OIG regarding audits of those ten healthcare providers – five of which encompass audits of Modifier 25 coding and billing, the practice at issue in this case. The OIG has never rejected or otherwise found fault with Relator's audits of these healthcare providers.

16.     Defendant Skyline Urology is a partnership organized under the laws of the State of California, with its headquarters at 20285 S. Western Avenue, Torrance, CA 90501. Skyline advertises itself on its website as "the largest group of urology specialists in the Western United States" and the "third largest urology group practice in the country." Skyline was formed in 2008 and currently operates 23 offices in over 20 cities throughout California, seeing more than 50,000 patients each year with over 150,000 office visits in the past year alone. During the events set forth below, Skyline's partnership fluctuated between approximately 80-100 doctors.

## III.   JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732.

18.     This Court has personal jurisdiction over Skyline pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Skyline has contacts with and conducts business in this District

and a substantial part of the events and omissions giving rise to this Complaint, including the government's overpayment of fraudulent claims, occurred in this District.

19.     Pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a), venue is proper because Skyline transacts and during all times relevant to this Complaint has transacted business in this District.

20.     Under 31 U.S.C. § 3730(e) and analogous provisions of the California FCA and the IFPA, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Even if there had been any such public disclosure, Relator would still be the original source of the allegations herein because he: 1) has direct, independent and material knowledge of the information that forms the basis of this Complaint; and 2) voluntarily disclosed that information to the Government before filing.

## IV.     APPLICABLE LAW

There are several payer programs that reimburse medical providers for both surgical and office visit E&M services.  These include Medicare, Medicaid, other federal and state funded programs, and commercial insurance payers in California.  Below is a summary of these programs as well as a background of the coding and billing procedures at issue in this case.

### A.     Federal and State-Funded Healthcare Programs

21.     Various federal and state-funded healthcare programs pay for both surgical and office visit E&M services in the manner described herein.  Examples of such payer programs include the following:

#### 1.     The Medicare Program

22.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End

Stage Renal Disease.  The Medicare program is administered through HHS' Centers for

Medicare and Medicaid Services ("CMS").

        23.     The Medicare program has four parts: Part A, Part B, Part C, and Part D.

Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient

hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary

Supplemental Insurance Plan, covers the cost of services performed by physicians and certain

other healthcare providers, such as services provided to Medicare patients by physicians,

laboratories, and diagnostic testing facilities.  *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).

Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized

prescription drug coverage for Medicare beneficiaries.

        24.     To administer the Medicare program, private insurance companies act as agents of

HHS, making payments on behalf of the program beneficiaries and providing other

administrative services.  42 U.S.C. §§ 1395h and 1395u.  These companies are called "carriers."

42 C.F.R. § 421.5(c).  Through local carriers, Medicare establishes and publishes the criteria for

determining what services are eligible for reimbursement or coverage.  This information is made

available to the providers who seek reimbursement from Medicare.

        25.     Noridian Healthcare Solutions ("Noridian") is the local carrier under contract with

CMS to administer Part B Medicare claims in California.

        26.     Medicare reimburses healthcare providers for the costs of providing covered

health services to Medicare beneficiaries.  *See* 42 U.S.C. § 1395x(v)(1)(A).  In order to bill

Medicare Part B, a provider must submit an electronic or hard-copy claim form called the CMS

1500 (formerly known as HCFA 1500 form) to the appropriate Medicare carrier.  The form

describes, among other things, the provider, the patient, the referring physician, the services

provided by procedure code (including any applicable modifiers), the related diagnosis code(s), the dates of service, and the amount charged. The provider certifies on the CMS 1500 claim form that the information provided is truthful and that the services billed on the claim form were "medically indicated and necessary."

27.     In addition, each Medicare provider must sign a provider agreement as a condition of participation, and by so doing must agree to comply with all Medicare requirements – including the fraud and abuse provisions. A provider that fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

28.     At all times relevant to this action, Noridian reviewed and approved the claims at issue in this case, based upon the enrollment information and claim information provided by Skyline, and relied on the veracity of the information in determining whether to pay the claims submitted by Skyline.

## 2.     The Medicaid Program

29.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the United States and those states participating in the program.

30.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

31.     Each physician who participates in the Medicaid program must execute a Medicaid provider agreement.  All states require that a Medicaid provider agree that it will comply with all federal and state Medicaid requirements.

32.     Medi-Cal is California's Medicaid program.

### 3.     Other Federally-Funded Healthcare Programs

33.     The United States administers other healthcare programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, the Federal Employee Health Benefit Program, and federal workers' compensation programs.

34.     TRICARE/CHAMPUS, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

35.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for the families of veterans with 100% service-connected disability.  38 U.S.C. §§ 1781-1786; 38 C.F.R. § 17.270(a).

36.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

37.     To the extent that California provides healthcare benefits to certain individuals, based either on the person's financial need, employment status, or other factors, and those programs are covered by the federal or California FCA, those programs are referred to in this Complaint as "state-funded" or "government-funded" healthcare programs.

### 4.   Commercial Insurance Programs

38.     Aside from the healthcare insurance programs outlined above, many healthcare consumers receive medical services that are paid for in whole or in part by commercial carriers, also known as private health insurance.

39.     Commercial insurance is typically sold by for-profit companies, although some not-for-profit organizations also offer commercial insurance.  These programs provide health insurance through either individual plans or group plans.  Individual plans offer insurance purchased directly by an individual.  Group plans are predominately offered to employees for purchase through their employers, though other organizations offer group plans as well.  For both individual and group insurance plans, commercial insurance is available only to consumers paying premiums in exchange for the insurance.

40.     In general, healthcare providers use the same billing codes for medical services and procedures submitted to commercial insurers as they do when they bill Medicare, Medicaid, or other government-funded programs.

### B.   Coding Rules for Surgical Procedures, E&M Services, and Modifier 25

### 1.   General Rules for Billing Physician Services

41.     Under the rules generally applicable to government-funded healthcare programs, physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS").   In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to provide them.  Payments are calculated by multiplying a standardized measure of the amount of resources the service or procedure is expected to require by a region-specific payment rate (conversion factor).

42.     RBRVS payments are based on the Healthcare Common Procedure Coding System ("HCPCS").  HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid, and other federal and state-funded healthcare programs pay for services rendered to patients by physicians and other healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render classes or types of medical care.  To ensure uniform descriptions of medical care rendered and consistent compensation for similar work, these federal and state-funded programs tie levels of reimbursement to these standardized codes.

43.     The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes (called Level I codes) and are published and updated annually by the American Medical Association.  Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management" (or E&M), "Anesthesiology," "Surgery,"  "Radiology," or general "Medicine") and the medical services and procedures commonly performed by physicians and other healthcare professionals working in that field.

44.     As described above, physicians typically submit claims for reimbursement to Medicare and Medicaid for professional services on Form CMS-1500.  That claim form sets forth the diagnostic code describing the patient's presenting condition and the procedural codes. On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient ...."

### 2.   Duty of Providers to Submit Truthful Bills and to Correct Known Errors and Falsehoods in Prior Bills

45.    Federal law prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." *See* 42 U.S.C. § 1320-a-7b(a)(1).

46.    Similarly, federal law requires providers who discover material omissions or errors in claims submitted to Medicare, Medicaid, or other federal healthcare programs to disclose those omissions or errors to the Government. *See* 42 U.S.C. § 1320-a-7b(a)(3).

47.    The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program, the Medicaid program, and other federally-funded healthcare programs. *See, e.g.,* 42 CFR §§ 1003.105, 1003.102(a)(1)-(2).

### 3.   E&M Services and Modifier 25

48.    Typically, when a health insurer pays a medical provider for having performed a procedure, the preoperative and postoperative care associated with the procedure is reimbursed through a single, global payment. *See* Medicare Claims Processing Manual ("MCPM") Chapter 12, § 40.2(A)(8). Under this system, the services that are contemplated as normal and expected in providing the procedure are bundled into a single CPT code, and the physician is reimbursed at a rate that has been established for the comprehensive care of the procedure.

49.    Physicians may not bill separately for such care, or any other services related to the procedure, using an E&M code. Medicare (and other insurers') claims payment systems will typically deny payment for an E&M service billed during a time period that overlaps with the global period for a procedure.

50.    However, physicians may bill for an E&M office visit performed on the same day as the procedure (or within the global period, if there is one) if the care provided during that

E&M visit "is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure." MCPM Chapter 12, §30.6.6(B).  To indicate that the E&M visit is "significant" and "separately identifiable," the physician must attach Modifier 25 to the CPT code used to bill for the E&M service. *Id.*

51.     Moreover, "[b]oth the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified nonphysician practitioner in the patient's medical record to support the claim for these services, even though the documentation is not required to be submitted with the claim." *Id.; see also* MCPM Chapter 12, §§ 40.2(A)(8); 40.3(B).

## V.     SKYLINE'S FRAUDULENT CODING AND BILLING PRACTICES CONCERNING MODIFIER 25

52.     Relator worked for Skyline for more than a year, auditing its physician claims. During that period, he discovered that Skyline was engaged in a consistent scheme to fraudulently bill for E&M services associated with surgical procedures through the improper use of Modifier 25.

53.     Although Relator informed Skyline of his findings, encouraged them to assess and correct the prior false billings, and offered to help train Skyline's physicians to correct these problems, Skyline did none of these things.

54.     Instead, Skyline terminated Relator's contract, and, to his knowledge, kept the proceeds of its prior false claims and continued to submit false and fraudulent bills for E&M services that were not properly payable by Medicare, Medicaid, other government-funded healthcare programs, and commercial insurers.

A.     **Skyline Engages Relator to Perform an Audit of Its Billing Practices**

55.     In approximately March of 2014, Heather Oskowis ("Oskowis"), of Solutions Medical Practice Management, LLC ("Solutions Medical"), reached out to Relator on behalf of Skyline.  She told Relator Skyline was looking for a consultant to audit Skyline's compliance with federal and state healthcare laws.  Oskowis asked Relator to submit a proposal of work for auditing and consulting on Skyline's coding and billing practices, and told Relator she would coordinate any work between Bay Area and Skyline, but that Relator's company would be directly hired by Skyline.

56.     After several months of negotiations, Relator (and Bay Area) agreed that Bay Area would audit Skyline's physician billings for one year, covering the second (April – June 2014), third (July – September 2014), and fourth (October-December 2014) quarters of 2014 and the first quarter (January – March 2015) of 2015.  The Agreement was executed on June 23, 2014 and signed by Dr. Richard David, President of Skyline.

57.     The Agreement provided that Bay Area's audit would be "performed in accordance with the American Medical Association Current Procedural Terminology (CPT) professional standards."  Bay Area would conduct this review by using "statistical sampling for the quarterly reviews. . . [to] insure appropriate tolerable rates of error, confidence intervals and stratifications."  In order to accomplish this goal, the Agreement contemplated that Bay Area would "[o]btain the universe of paid claims from Skyline so Bay Area may make an accurate and complete sample selection," and that Bay Area would "stratify the sample to insure high volume high exposure areas are included in the sample (E/M – 25, Consultations, Procedures, Diagnostic testing)."

58.     Stratifying would provide a more reliable review because it would be sure to capture a statistically significant sampling of billing codes that are either often coded or often

15

erroneously coded (i.e. the "high volume high exposure areas"). The "E/M – 25" referenced in the Agreement refers to Modifier 25.

59.    Shortly after Dr. David executed the Agreement, Relator had a phone call with Dr. David and Oskowis, during which Relator outlined the steps for completing the compliance audit. Contrary to the Agreement's audit plan, Dr. David suggested Bay Area complete its review without Skyline first providing a complete set of data to Bay Area so it could extract a stratified sample from the data. Such data would have included all of the doctor names, patient names, dates of service, and billing and financial information. During that call, Relator stressed the need to have a stratified sample to ensure that Bay Area could include a statistically meaningful review of Skyline's coding on higher dollar value and higher frequency (and therefore higher risk for error) medical services. This recommendation followed the practice Relator used with all of his other healthcare clients during audits.

60.    Dr. David rejected Relator's suggestions, saying Bay Area's review of Skyline's billing practices "didn't need to be statistical."

61.    Instead of the approach recommended by Relator, Dr. David directed Relator to randomly select for each quarterly review ten of Skyline's physicians. Once the physicians were selected, Skyline would provide Bay Area with files regarding each of those physicians limited to patient names and service dates for the quarter. Bay Area would then randomly select ten patients from each physician file, and Oskowis or Jennifer Tucker, Solutions Medical's Director of Operations ("Tucker"), would provide Bay Area with complete data, including financial and clinical information, for those ten selected patients.

**B.**      **Relator Reports to Skyline a Pattern of Improper Use of Modifier 25**

62.      In September 2014, Bay Area audited Skyline for services provided during the Second Quarter of 2014.  Ninety patient records for nine physicians were reviewed for this period (Skyline did not provide sufficient information for the review of a tenth physician).

63.      To perform this work, Bay Area hired Marsha Diamond ("Diamond"), of Medical Audit Resource Services, Inc.  Diamond is a Certified Medical Coder, a Certified Medical coder-Hospital, and a Certified Coding Specialist.  She has over 30 years of experience involving medical coding, compliance, billing, healthcare reimbursement, education, and management fields.  Diamond is the author of numerous coding textbooks, including *Mastering Medical Coding*, *Code Compass*, *Understanding Hospital Coding and Billing*, and the *Coder's Resource Handbook*.  She has had numerous articles published in coding and compliance publications and newsletters.

64.      Diamond is also the Program Director/Instructor of Coding and Health Information at Central Florida College in Orlando, Florida, and a well-respected presenter at national conferences for coding and medical practice management organizations such as the American Academy of Professional Coders, the Medical Group Management Association, and the American Health Information Management Association.  Diamond is also a former AAPC National Advisory Board member and a former President of the Orlando Chapter of Ingenix, where she currently serves as an Advisory Board Member.

65.      Bay Area had used Diamond on several projects prior to the Skyline audit and found her work to be exceptional.

66.     During that initial audit of Skyline's Second Quarter 2014 claims, Diamond and Relator began discovering alarmingly high error rates for coding/billing Modifier 25.  In Relator's experience, a typical error rate for these types of claims was usually below 5%.

67.     By October 2014, Relator completed the audit.  Of the 90 patient records reviewed, 51 involved coding for Modifier 25, and 40 (78%) of those were improperly coded.

68.     All nine of the physicians reviewed had error rates of 60% or higher.  Seven of the nine physicians improperly billed Modifier 25 at least 70% of the time, and two physicians had 100% error rates.

69.     Relator told Skyline (through Oskowis) about his troubling findings in an October 27, 2014 email.

70.     On November 12, 2014, Oskowis responded in an email, telling Relator that Skyline's Quality Assurance Committee ("QA Committee") had reviewed Relator's audit findings and wanted to discuss the results.  Oskowis also said that Skyline's QA Committee disagreed with some of Relator's findings.

71.     Relator and Oskowis then exchanged emails discussing the results of the audit and the particular cases that the QA Committee wanted to discuss.  Relator requested a call with the QA Committee because he believed that the high error rates needed to be addressed, but that request was ignored by Skyline.

72.     On December 7, 2014, Tucker began sending patient data to Bay Area for ten physicians so Bay Area could begin auditing the Third Quarter 2014.  On, January 9, 2015, Oskowis emailed Relator, asking about the status of the Third Quarter 2014 audits.

73.     In that same email, she also asked how much it would cost Skyline to have Relator conduct a "sit down review" with Skyline physicians.  During follow-up

communications with Oskowis that day, Relator learned Skyline was interested in "mandatory education" classes for physicians with error rates exceeding 20% and "informal education" classes for physicians with lower ones.  The express purpose would be to review the audits Bay Area conducted.

74.     On January 12, Relator emailed an education plan to Oskowis containing the error rates for the physicians from the Second Quarter 2014 audit, and a list of steps for training each physician on proper coding.

75.     Oskowis did not respond to that email, but instead, told Relator that Dr. David wanted to "have a conference call tomorrow to discuss the '25' modifier item that came out during the last chart audit."

76.     That call was ultimately held January 15, 2015.  On the call, Relator, Dr. David, Diamond, and Oskowis discussed the abnormally high error rates for coding Modifier 25 in the Second Quarter 2014 audit.  Relator explained that Skyline physicians' 60 - 100% error rates were well beyond anything he had seen before.  He also explained that they had hired a very respected coder in Diamond, so he was sure they were not incorrect in their audit.

77.     Relator informed Dr. David that his opinion was that Skyline had a serious, systemic issue with improper coding of Modifier 25, and that Medicare and other payers had been overbilled.  Dr. David disagreed with a few of the audit's results, but agreed with Relator's findings regarding the majority of errors coding and billing Modifier 25 that Relator found.

78.     Relator also told Dr. David that Skyline needed to conduct a more extensive review – one that was stratified and statistically relevant (and consistent with audits Relator conducted for his other clients, including clients he was auditing for the OIG) – in order to

determine just how bad the problem was. Relator explained that the overpayments needed to be quantified and that they should be paid back to the Government.

79.      Despite Dr. David's recognition that Relator's audit had identified Modifier 25 coding problems, Dr. David rejected Relator's recommendations for a more extensive audit and repayment to the Government. He did not appear to be concerned about the results of Relator's audit and said that Skyline did not have a problem with coding and billing Modifier 25 because previous audits had not found similar problems.

80.      In response, Relator requested that Skyline send him the results of those previous audits so he could examine their results. Skyline never sent Relator the results the purported earlier audits.

81.      During the call, Relator again recommended that Skyline conduct education sessions with Skyline's doctors. Skyline did not take Relator up on this offer.

82.      On January 21, 2015, Relator emailed Oskowis to inform her that after the January 15 conference call, Bay Area had reviewed the results of the Second Quarter 2014 audit and the Third Quarter 2014 audit with Dr. David's comments in mind. He related that only three findings of improper coding of Modifier 25 could possibly be revised to findings of proper coding based on what he had learned from Dr. David.

83.      The results of the Third Quarter 2014 audit were consistent with the alarming findings for the earlier quarter. Relator audited ten physicians, and all of those physicians used Modifier 25 in that period. The audit found that of the 31 instances where these physicians used Modifier 25, 13 (41%) were improperly coded.

84.      On January 22, 2015, Tucker began sending Bay Area the data needed to conduct the audit of the Fourth Quarter 2014.

85.     Two weeks later, on February 5, 2015, Relator reported back to Oskowis and

Tucker via email that the Modifier 25 error rates continued to be an issue "consistent with prior

periods." In that email, Relator suggested they have another conference call with Dr. David to

discuss the continuing high error rates. As a result, a conference call with Relator, Diamond, Dr.

David, and Oskowis was set for February 19, 2015.

86.     On February 16, 2015, Oskowis asked Relator to send Skyline five examples of

claims that had been found to be improperly coded with Modifier 25 for discussion during the

upcoming call. Relator responded on February 18 and 19 via email, listing the five examples.

To protect the confidentiality of the patients in questions, the five exemplar patients are not

identified in this Complaint. Information identifying them and claims for payment regarding

their medical procedures is included in documents Relator has provided to the Government.

That information is incorporated herein by reference.

87.     During the February 19 conference call, Diamond reviewed the five examples to

show how they were incorrectly coded and billed for Modifier 25 and provided education on

correct coding/billing. Dr. David did not disagree with the findings that the five examples

represented incorrect coding/billing of Modifier 25.

88.     Consistent with the January 15 call, Relator explained to Dr. David that Skyline

had continued to incorrectly bill and receive overpayments for Modifier 25. Relator also noted

that the errors on coding and billing Modifier 25 were only one way: Skyline was incorrectly

coding and billing for Modifier 25 to receive payments in cases where it should not, but was not

making similar errors to fail to code and bill for Modifier 25 when it was entitled to do so.

89.     Relator again stressed the need to sit down with Skyline's physicians and educate

and train them on proper coding procedures for Modifier 25, but Dr. David ignored this

suggestion.  As an alternative, Relator offered to provide Dr. David with some materials that he could present to his partners regarding the proper use of Modifier 25.

90.     By the end of February 2015, Relator had completed the audit of Skyline's Fourth Quarter 2014.  Relator audited 110 patient records for eleven physicians from that time period. Of these 110 claims, 49 involved coding Modifier 25, and of those, 26 (53%) were improperly coded.

91.     On March 11, 2015, Oskowis emailed Relator, copying Dr. David, reminding him that he had offered to provide "something that Dr. David could present to his fellow partners in regards to the use of the '25' modifier."  She noted in that email that Dr. David would be meeting with the Skyline partners on March 23, 2015.

92.     The following day, Relator responded to Oskowis, copying Dr. David, with an email that included two attachments.  One attachment was a summary intended to help Skyline physicians identify basic criteria for determining when it was appropriate to code Modifier 25. The other was an 18-page PowerPoint presentation on Modifier 25 written by Bay Area. Included in that PowerPoint presentation were five additional examples of Skyline physicians improperly coding Modifier 25.

93.     Slides number 11 – 15 of the PowerPoint presentation included information on five patients of two Skyline physicians, Dr. Flechner and Dr. Naftulin.  Three of the five examples involved the physicians improperly billing Medicare Southern California for the Modifier 25 code.  The other two instances involved improper billing for the Modifier 25 code to Blue Shield of California.  To protect patient identifiable information, Relator has not included more specific detail about this PowerPoint in the Complaint, but instead has provided the

PowerPoint to the Government.  Accordingly, the content of the PowerPoint is incorporated in the Complaint by reference.

94.     Relator never received a response from Skyline regarding the PowerPoint presentation or a request for follow-up from Skyline on the Modifier 25 coding issues he identified.

95.     In June 2015, Bay Area completed its audit of Skyline's First Quarter 2015.  The results were troublingly similar.  Relator audited 100 patient records for 10 physicians from that quarter.  Of these 100 records, 34 involved coding for Modifier 25, and 21 (61%) were improper.

96.     In July 2015, Oskowis requested that Relator continue the audit of Skyline for the Second Quarter 2015, beyond the scope of work contemplated in the Agreement.  The results were similar to the findings for the earlier periods – alarmingly high error rates for the use of Modifier 25.  Relator was able to review 68 patient records from seven physicians, and found an error rate of 36% for coding Modifier 25.  Four of the seven physicians reviewed had error rates of 50% or higher.

97.     On September 21, 2015, Oskowis informed Relator by email that Skyline had chosen not to renew his contract.

## VI.   SKYLINE'S CONDUCT WAS FRAUDULENT AND MATERIAL

98.     As set forth above, Relator and those working for Bay Area had infrequently discovered error rates for coding and billing Modifier 25 that were over 5% in prior audits of other healthcare providers.  In fact, Relator has never witnessed such high error rates for coding and billing of any CPT code by any healthcare provider as those he found for Skyline.

99.     Despite these findings and Relator's warnings to Skyline about its coding and billing problems, during the time Relator was employed by Skyline, Skyline never conducted remedial training for its Modifier 25 coding errors, nor is Relator aware that Skyline ever repaid

the Government or commercial insurers for its overbilling related to the improper use of Modifier 25.

100.     Likewise, Relator does not believe and did not witness that Skyline ever performed a more extensive audit of its Modifier 25 coding and billing practices.

101.     Skyline's improper coding and billing of Modifier 25 were material to the Government and commercial insurers' decisions to reimburse Skyline for claims it improperly submitted for payment involving Modifier 25.  Government and commercial payers will not pay separately for E&M services that are normally contemplated and expected to occur with procedures billed under a global CPT code.  Therefore, when Skyline improperly coded and billed for Modifier 25, it was paid for claims that such payers would not otherwise pay.

102.     All such claims for E&M services where Modifier 25 was improperly coded and billed by Skyline are false and/or fraudulent claims within the meaning of the federal and California FCAs and the IFPA.

103.     Likewise, Skyline's failure to repay these improperly billed Modifier 25 claims— submitted both before and after Relator notified Skyline of their impropriety—are false and/or fraudulent claims within the meaning of the federal and California FCAs and the IFPA.

### Count I
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A), (B), & (G)

104.     Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 103 above as though fully set forth herein.

105.     This is a claim for treble damages and penalties under the False Claims Act.

106.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

107.   By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

108.   By virtue of the acts described above, Defendant knowingly concealed overpayments from the United States Government and failed to remit such overpayments in violation of 31 U.S.C. § 3729(a)(1)(G).

109.   The Government—unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant—paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

110.   By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

111.   Additionally, the United States is entitled to the maximum penalty of up to $21,563 for each and every violation alleged herein.

## Count II
## California False Claims Act
## Cal. Gov Code. §§ 12651(a)(1), (2), (7), & (8)

112.   Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 111 above as though fully set forth herein.

113.   This is a claim for treble damages and penalties under the California False Claims Act.

114.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false claims to the State of California for payment or approval in violation of Cal. Gov Code. § 12651(a)(1).

115.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of California to approve and pay such false and fraudulent claims in violation of Cal. Gov Code. § 12651(a)(2).

116.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation to transmit money to the State of California, and knowingly concealed or knowingly and improperly avoided an obligation to transmit money to the State of California in violation of Cal. Gov Code. § 12651(a)(7).

117.    By virtue of the acts described above, Defendant was the beneficiary of the inadvertent submission of false claims, subsequently discovered the falsity of those claims, and failed to disclose to the false claims to State of California within a reasonable time after discovery of the false claims in violation of Cal. Gov Code. § 12651(a)(8).

118.    The State of California—unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant—paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

119.    By reason of Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

120.    Additionally, the State of California is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count III**
**California Insurance Frauds Protection Act**
**Cal. Ins. Code § 1871.7**

121.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 120 above as though fully set forth herein.

122.    This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act.

123.    By virtue of the acts described above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for healthcare benefits in violation of California Penal Code § 550(a)(1).

124.    By virtue of the acts described above, Defendant knowingly prepared, made, or subscribed to writings with the intent to present or use them, or to allow them to be presented, in support of false or fraudulent claims for healthcare benefits in violation of California Penal Code § 550(a)(5).

125.    By virtue of the acts described above, Defendant knowingly made, or caused to be made, false or fraudulent claims for payment of healthcare benefits in violation of California Penal Code § 550(a)(6).

126.    By virtue of the acts described above, Defendant presented, or caused to be presented, written or oral statements as part of, or in support of, claims for payment or other benefits pursuant to insurance policies, knowing that the statements contained false or misleading information concerning material facts in violation of California Penal Code § 550(b)(1).

127.    By virtue of the acts described above, Defendant prepared or made written or oral statements intended to be presented to insurers or insurance claimants in connection with, or in

support of or opposition to, claims or payments or other benefits pursuant to insurance policies,

knowing the statements contained false or misleading information concerning material facts in

violation of California Penal Code § 550(b)(2).

128.    By virtue of the acts described above, Defendant concealed, or knowingly failed

to disclose the occurrence of, an event that affected a person's initial or continued right or

entitlement to an insurance benefit or payment, or the amount of a benefit or payment to which

the person was entitled, in violation of California Penal Code § 550(b)(3).

129.    Commercial insurers—unaware of the falsity of the records, statements and

claims made or caused to be made by Defendant—paid and continue to pay the claims that

would not be paid but for Defendant's illegal conduct.

130.    The State of California is entitled to receive from Defendant three times the

amount of each claim for compensation Defendant submitted in violation of the IFPA.

Additionally, the State of California is entitled to a maximum penalty of $10,000 for each and

every violation of the IFPA alleged in this Complaint.

## PRAYER

WHEREFORE, Relator prays for judgment against the Defendant as follows:

1.    That Defendant cease and desist from violating the False Claims Act, the

California False Claims Act, and the California Insurance Frauds Prevention Act;

2.    That this Court enter judgment against Defendant in an amount equal to three

times the amount of damages the United States has sustained because of Defendant's actions,

plus a civil penalty of $11,000 for each violation of the False Claims Act that occurred on or

before November 2, 2015 and a civil penalty of $21,563 for each violation occurring after

November 2, 2015;

3.      That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of California has sustained because of Defendant's actions,  plus a civil penalty of $11,000 for each violation of the California False Claims Act;

4.      That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of California has sustained because of Defendant's actions, plus a civil penalty of $10,000 for each violation of California Insurance Frauds Prevention Act;

5.      That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and the comparable provisions of the California False Claims Act and the California Insurance Frauds Prevention Act;

6.      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

7.      That Relator recovers such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.

Dated:  December 21, 2016                    **CONSTANTINE CANNON LLP**

By: _____

Seth D. Greenstein, MD Bar #11298
Mary Inman
Jason Enzler
1001 Pennsylvania Avenue, NW
Washington DC  20004
Telephone:  202-204-3500
Facsimile:  202-204-3501
sgreenstein@constantinecannon.com

Attorneys for Plaintiff-Relator

29